JUDGE ABRAMS

PREET BHARARA
United States Attorney for
the Southern District of New York
By:  SHARON COHEN LEVIN
     CHRISTINE I. MAGDO
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2270/2297



13 CIV 3565

RECEIVED
MAY 28 2013
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

                     Plaintiff,              :        <u>VERIFIED COMPLAINT</u>

          - v. -                             :        13 Civ.

THE FOLLOWING DOMAIN NAMES:                  :

WM-CENTER.COM;                               :
E-NAIRA.COM;
ECARDONE.COM;                                :
EBUYGOLD.COM;
GETEMONEY.COM;                               :
EPAYMONSTER.COM;
INSTANTGOLDNG.COM;                           :
JTGOLD.COM;
GOLDNAIRAEXCHANGE.COM;                       :
SUPERCHANGE.RU;
WEBMONEY.CO.NZ;                              :
M-GOLD.COM;
GOLDMEDIATOR.COM;                            :
ABSOLUTEXCHANGE.EU;
MEWAHGOLD.COM;                               :
CENTREGOLD.CA;
ELECTRUMX.COM;                               :
TUKARDUID.COM;
ENTELNOVA.COM;                               :
TACOAUTHORIZED.COM;
INTEXCHANGE.COM;                             :
UKRNETMONEY.COM;
WMIRK.COM;                                   :
NIGERIAGOLDEXCHANGER.COM;
EDEALSPOT.COM;                               :
DUYDUYCHANGER.COM;
MAGNETIC-EXCHANGE.COM;                       :
MONEYEXCHANGE.VN;

```
ABC-EX.NET;                          :
MI-BILLETERA.COM;
NICCIEXCHANGE.COM;                   :
EXHERE.COM;
ALERTEXCHANGER.COM;                  :
VELAEXCHANGE.COM;
GOLDEXPAY.COM;                       :

            Defendants-in-rem.   :

- - - - - - - - - - - - - - - -x
```

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I.   JURISDICTION AND VENUE

1. This action is brought by the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), seeking the forfeiture of the following domain names: WM-CENTER.COM; E-NAIRA.COM; ECARDONE.COM; EBUYGOLD.COM; GETEMONEY.COM; EPAYMONSTER.COM; INSTANTGOLDNG.COM; JTGOLD.COM; GOLDNAIRAEXCHANGE.COM; SUPERCHANGE.RU; WEBMONEY.CO.NZ; M-GOLD.COM; GOLDMEDIATOR.COM; ABSOLUTEXCHANGE.EU; MEWAHGOLD.COM; CENTREGOLD.CA; ELECTRUMX.COM; TUKARDUID.COM; ENTELNOVA.COM; TACOAUTHORIZED.COM; INTEXCHANGE.COM; UKRNETMONEY.COM; WMIRK.COM; NIGERIAGOLDEXCHANGER.COM; EDEALSPOT.COM; DUYDUYCHANGER.COM; MAGNETIC-EXCHANGE.COM; MONEYEXCHANGE.VN; ABC-EX.NET; MI-BILLETERA.COM; NICCIEXCHANGE.COM; EXHERE.COM; ALERTEXCHANGER.COM;

VELAEXCHANGE.COM; and GOLDEXPAY.COM (collectively the "Defendant Domain Names").

2.   This Court has jurisdiction over this action pursuant to Title 28, United States Code, Section 1355(b)(1), which provides that a forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred.

3.   Venue is proper pursuant to Title 28, United States Code, Section 1395(a) because the cause of action accrued in the Southern District of New York, and the Defendant Domain Names are found in the Southern District of New York, in that they were accessed by computers located in the Southern District of New York.

4.   Venue is further proper pursuant to Title 28, United States Code, Section 1395(b) because the property that the United States seeks to forfeit is found in the Southern District of New York, in that the Defendant Domain Names were accessed by computers located in the Southern District of New York.

## II.   THE DEFENDANT DOMAIN NAMES ARE FORFEITABLE PROPERTY

### Background

5.   For years, Liberty Reserve S.A. ("Liberty Reserve"), a company incorporated in Costa Rica in 2006, operated one of the world's most widely used digital currencies.  Through its website, www.libertyreserve.com, Liberty Reserve provided its

users with what it described as "instant, real-time currency for international commerce," which can be used to "send and receive payments from anyone, anywhere on the globe." Liberty Reserve also touted itself as the Internet's "largest payment processor and money transfer system," serving "millions" of people around the world, including the United States. At no time, however, did Liberty Reserve register with the United States Department of the Treasury as a money transmitting business.

6.   Arthur Budovsky ("Budovsky"), Vladimir Kats ("Kats"), Ahmed Yassine Abdelghani ("Yassine"), Azzeddine El Amine ("El Amine"), Allan Esteban Hidalgo Jimenez ("Hidalgo"), Mark Marmilev ("Marmilev"), and Maxim Chukharev ("Chukharev") intentionally created, structured, and operated Liberty Reserve as a criminal business venture, one designed to help criminals conduct illegal transactions and launder the proceeds of their crimes. Liberty Reserve was designed to attract and maintain a customer base of criminals by, among other things, enabling users to conduct anonymous and untraceable financial transactions.

7.   Liberty Reserve emerged as one of the principal means by which cyber-criminals around the world distributed, stored, and laundered the proceeds of their illegal activity. Indeed, Liberty Reserve became a financial hub of the cyber-crime world, facilitating a broad range of online criminal activity, including credit card fraud, identity theft, investment fraud,

4

computer hacking, child pornography, and narcotics trafficking. Virtually all of Liberty Reserve's business derived from suspected criminal activity.

8.   The scope of Liberty Reserve's criminal operations was staggering. Estimated to have had more than one million users worldwide, with more than 200,000 users in the United States, Liberty Reserve processed more than 12 million financial transactions annually, with a combined value of more than $1.4 billion. Overall, from 2006 to May 2013, Liberty Reserve processed an estimated 55 million separate financial transactions and is believed to have laundered more than $6 billion in criminal proceeds.

9.   To use Liberty Reserve's digital currency, commonly referred to as "LR," a user first was required to open an account through the Liberty Reserve website. In registering, the user was required to provide basic identifying information, such as name, address, and date of birth. However, unlike traditional banks or legitimate online payment processors, Liberty Reserve did not require users to validate their identity information, such as by providing official identification documents or a credit card. Accounts could therefore be opened easily using fictitious or anonymous identities.

10.   Once a user established an account with Liberty Reserve, the user could then conduct transactions with other

Liberty Reserve users.  That is, the user could receive transfers of LR from other users' accounts, and transfer LR from his own account to other users - including any "merchants" that accepted LR as payment.  Liberty Reserve charged a one-percent fee every time a user transferred LR to another user through the Liberty Reserve system, up to a maximum fee of $2.99 per transaction.  In addition, for an additional "privacy fee" of 75 cents per transaction, a user could hide his own Liberty Reserve account number when transferring funds, effectively making the transfer completely untraceable, even within Liberty Reserve's already opaque system.

11.  To add an additional layer of anonymity, Liberty Reserve did not permit users to fund their accounts by transferring money to Liberty Reserve directly, such as by issuing a credit card payment or wire transfer to Liberty Reserve.  Nor could Liberty Reserve users withdraw funds from their accounts directly, such as through an ATM withdrawal. Instead, Liberty Reserve users were required to make any deposits or withdrawals through the use of third-party "exchangers," thus enabling Liberty Reserve to avoid collecting any information about its users through banking transactions or other activity that would leave a centralized financial paper trail.

12.  Liberty Reserve's "exchangers" were third-party entities that maintained direct financial relationships with

6

Liberty Reserve, buying and selling LR in bulk from Liberty Reserve in exchange for mainstream currency. The exchangers in turn bought and sold this LR in smaller transactions with end users in exchange for mainstream currency. Thus, in order to fund a Liberty Reserve account, a user was required to transmit mainstream currency in some fashion (through a money remitter, for example) to an exchanger. Upon receiving the user's payment, the exchanger credited the user's Liberty Reserve account with a corresponding amount of LR, by transferring LR from the exchanger's Liberty Reserve account to the user's account. Similarly, if a Liberty Reserve user wished to withdraw funds from his account, the user was required to transfer LR from his Liberty Reserve account to an exchanger's Liberty Reserve account, and the exchanger then made arrangements to provide the user a corresponding amount of mainstream currency.

13. The Liberty Reserve website recommended a number of "pre-approved" exchangers, among which were the exchangers that use the Defendant Domain Names for their websites. These exchangers tended to be unlicensed money transmitting businesses operating without significant governmental oversight or regulation, concentrated in Malaysia, Russia, Nigeria, and Vietnam. The exchangers charged transaction fees for their services, typically amounting to five percent or more of the funds being exchanged. Such fees were much higher than those

charged by mainstream banks or payment processors for comparable money transfers.

## The Related Criminal Case

14. On May 20, 2013, a grand jury in the Southern District of New York returned a sealed indictment charging Liberty Reserve, Budovsky, Kats, Yassine, El Amine, Hidalgo, Marmilev, and Chukharev with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One); conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371 (Count 2); and operation of an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 2 (Count Three). See United States v. Liberty Reserve, et al., 13 Cr. 368 (DLC) (the "Indictment"). The Indictment alleges, among other things, that the defendants operated an international online digital currency service and money transfer system through the website www.libertyreserve.com that was designed to attract and maintain a customer base of criminals and, in fact, became the online service preferred by cyber-criminals around the world for distributing, storing, and laundering the proceeds of their criminal activity, in violation of 18 U.S.C. § 1956(h). Furthermore, as alleged in the Indictment, by operating the Liberty Reserve website, the defendants operated, and engaged in a conspiracy to operate, an unlicensed money transmitting business, in violation of 18 U.S.C.

§§ 1960, 371, and 2.  A true and correct copy of the Indictment

is attached hereto as Exhibit A and is incorporated by reference

as if fully set forth herein.

      15.  As part of the criminal case against Liberty

Reserve et al., on May 23, 2013, the United States obtained a

post-indictment seizure warrant (the "Seizure Warrant"), pursuant

to 21 U.S.C. § 853(e) and (f), for the domain name

LibertyReserve.com, as well as for the domain names used by four

online exchangers owned or controlled by certain of the

individuals charged in the Indictment (the "Seized Domain

Names").[1]  The Honorable Denise L. Cote, United States District

Judge, found probable cause to believe that the Seized Domain

Names were property subject to seizure and criminal forfeiture

pursuant to 18 U.S.C. § 982(a)(1).  A true and correct copy of

the Seizure Warrant is attached hereto as Exhibit B and is

incorporated by reference as if fully set forth herein.  A true

and correct copy of the Declaration of Special Agent Tate Jarrow

of the United States Secret Service (the "Jarrow Decl.")

submitted in support of the Government's application for the

Seizure Warrant is annexed hereto as Exhibit C and is

---

    [1] The four exchanger domain names that were subjects of the
Seizure Warrant (ExchangeZone.com, Swiftexchanger.com,
MoneyCentralMarket.com, and AsianaGold.com) are not named as in
rem defendants in this action.

incorporated by reference as if fully set forth herein.   The Seizure Warrant was executed on May 24, 2013.

16.   Also on May 24, 2013, Budovsky, El Amine, Marmilev, Kats and Chukharev were arrested on the charges in the Indictment.

17.   As further part of the criminal investigation, the United States obtained seizure warrants or restraining orders for 45 bank accounts located in the United States, Costa Rica, Cyprus, Australia, Morocco, Spain, Hong Kong, China, Latvia, and Russia, which have already resulted in the seizure or restraint of approximately $25 million. In addition, pursuant to court-authorized warrants, more than 45 searches and seizures have been carried out in multiple countries, including the United States, Costa Rica, Sweden, Switzerland, and the Netherlands.

### Domain Names in General

18.   Domain names operate as follows:

a.   A domain name is a simple, easy-to-remember way for people to identify computers on the Internet.   For example, "www.google.com" and "www.yahoo.com" are domain names.

b.   The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names.   Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "www.example.com."   The hierarchy of domains descends from right to left; each label to the left

10

specifies a subdivision, or subdomain, of the domain on the right. The right-most label conveys the "top-level" domain. For example, the domain name "www.example.com" means that the computer assigned that name is in the ".com" top-level domain and the "example" second-level domain, and is a web server (denoted by the "www").

       c.   DNS servers are computers connected to the Internet that convert domain names that are easy for people to remember into Internet Protocol ("IP") addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet. An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. DNS servers can be said to "resolve" or "translate" domain names into IP addresses.

       d.   For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address. For example, the registry for the ".tv," ".net," and ".com" top-level domains is VeriSign, Inc.

       e.   If an individual or business wants to purchase a domain name, they buy it through a company called a

"registrar."  Network Solutions LLC ("Network Solutions") and GoDaddy.com Inc. ("GoDaddy") are two well-known examples of registrars, although there are hundreds of registrars on the Internet.  The registrar, in turn, communicates this purchase to the relevant registry.  The individual or business who purchases, or registers, a domain name is called a "registrant."

      f.   Registrants control the IP address, and thus the computer, to which the domain name resolves.  Thus, a registrant may easily move a domain name to another computer anywhere in the world simply by changing the IP address at the registry.

      g.   Registries and/or registrars maintain additional information about domain names, including the name and contact information of the registrant.

## The Defendant Domain Names

    19.  In connection with the investigation, and based on their review of the various webpages that are accessible via the Defendant Domain Names, federal law enforcement agents learned the following:

    20.  The Liberty Reserve website, before it was shut down by federal law enforcement on May 24, 2013, displayed a list of "pre-approved" online exchangers, which included the websites affiliated with the Defendant Domain Names.  As explained above, individuals wishing to use Liberty Reserve's anonymous digital

currency system were required to use an online exchanger in order to convert their LR digital currency into real currency, and vice-versa.

21.   In or about May 2013, a federal law enforcement agent visited the sites affiliated with the Defendant Domain Names and took numerous "screen shots" of the sites, capturing what the websites looked like to one visiting the site on the Internet at that time.  The websites all described their services as electronic currency exchange, e-currency exchange or digital currency exchange, and most also specifically advertised that they served as exchangers for Liberty Reserve.

22.   For example, the website associated with E-NAIRA.COM, the defendant, held itself out as, "The leading Liberty Reserve exchanger located in Africa."  The website associated with EPAYMONSTER.COM, the defendant, touted itself as, "One of Nigeria's largest and most trusted accredited Liberty Reserve exchangers."  The website associated with GOLDNAIRAEXCHANGE.COM, the defendant, advertised that it was "Nigeria's First and Largest Liberty Reserve Exchanger."  The website associated with EDEALSPOT.COM, the defendant, claimed that it "exclusively support[s] Liberty Reserve with the best rates."

23.   Furthermore, the websites associated with the Defendant Domain Names provided exchanger services for users of

Liberty Reserve. This was determined by various methods, including reviewing bank records, analyzing server data, engaging in undercover transactions, and reviewing email correspondence.

## III.   PROBABLE CAUSE FOR FORFEITURE

24.  As explained above and as alleged in the Indictment, Liberty Reserve and its principals engaged in a money laundering conspiracy by operating a digital currency website that catered to cyber-criminals. The exchanger websites associated with the Defendant Domain Names were directly involved in Liberty Reserve's money laundering operation, in at least two ways.  First, they allowed users of Liberty Reserve's digital currency to exchange their real currency for LR, and their LR for real currency.  In other words, the Defendant Domain Names were used to fund Liberty Reserve's Operations; without them, there would not have been money for Liberty Reserve to launder. Second, the Defendant Domain Names were used to add another layer of anonymity to each transaction processed through Liberty Reserve, thus directly appealing to cyber-criminals who were looking to launder the proceeds of their criminal activities.

25.  Because the websites associated with the Defendant Domain Names bought and sold LR for real currency, they were involved in and facilitated Liberty Reserve's primary function, which was to launder money.  Accordingly, the Defendant Domain Names are property involved in the money laundering conspiracy

14

charged in the Indictment, and are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1).

26.   In sum, there is probable cause to believe that the Defendant Domain Names constitute property involved in a conspiracy to commit money laundering, or property traceable to such property, in violation of Title 18, United States Code, Section 1956(h).   Accordingly, the Defendant Domain Names are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## IV.   CLAIM FOR FORFEITURE

27.   Paragraphs 1 through 26 of this Complaint are repeated and realleged as if fully set forth herein.

28.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1960 . . . of [Title 18], or any property traceable to such property," is subject to forfeiture.

29.   Pursuant to Title 18, United States Code, Section 1956, commonly known as the "money laundering" statute, a person who:

> (a)(1) . . . knowing that the property
> involved in a financial transaction
> represents the proceeds of some form of
> unlawful activity, conducts or attempts to
> conduct such a financial transaction which in
> fact involves the proceeds of specified
> unlawful activity –

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part –

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be guilty of a crime.

30.   Title 18, United States Code, Section 1956 further provides, in pertinent part, that

(a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States –

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part –

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

shall be guilty of a crime.

31.  Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

32.  By reason of the above, the Defendant Domain Names are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Domain Names and that all persons having an interest in the Defendant Domain Names be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Domain Names to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: May 28, 2013
       New York, New York

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
    SHARON COHEN LEVIN
    CHRISTINE I. MAGDO
    Assistant United States Attorneys
    One Saint Andrew's Plaza
    New York, New York 10007
    Tel.: (212) 637-1060 / 2297
    Facsimile: (212) 637-0421

18

**VERIFICATION**

STATE OF NEW YORK                              )
COUNTY OF NEW YORK                             )
SOUTHERN DISTRICT OF NEW YORK                  )

      TATE JARROW, being duly sworn, deposes and says that he is a Special Agent with the United States Secret Service, and, as such, has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information, and belief.

      The sources of the deponent's information and the grounds for his belief are his personal knowledge and the official records and files of the United States Government.

Dated:   New York, New York
        May 28, 2013

                                _____
                                Tate Jarrow
                                Special Agent
                                United States Secret Service

Sworn to before me this
28th day of May, 2013

_____
    Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires ___May 8, 2014___

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :
                                :
          - v. -                :        SEALED INDICTMENT
                                :
LIBERTY RESERVE S.A.,           :        13 Cr.
ARTHUR BUDOVSKY,                :
     a/k/a "Arthur Belanchuk,"  :
     a/k/a "Eric Paltz,"        :
VLADIMIR KATS,                  :
     a/k/a "Ragnar,"            :        13 CRIM368
AHMED YASSINE ABDELGHANI,       :
     a/k/a "Alex,"              :
ALLAN ESTEBAN HIDALGO JIMENEZ,  :
     a/k/a "Allan Garcia,"      :
AZZEDDINE EL AMINE,             :
MARK MARMILEV,                  :
     a/k/a "Marko,"             :
     a/k/a "Mark Halls," and    :
MAXIM CHUKHAREV,                :
                                :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy to Commit Money Laundering)

The Grand Jury charges:

### THE DEFENDANTS

1.   Incorporated in Costa Rica in 2006, LIBERTY RESERVE

S.A. ("LIBERTY RESERVE"), the defendant, has for years operated

one of the world's most widely used digital currencies.  Through

its website, www.libertyreserve.com, LIBERTY RESERVE has

provided its users with what it described as "instant, real-time

currency for international commerce," which can be used to "send

and receive payments from anyone, anywhere on the globe." LIBERTY RESERVE also touted itself as the Internet's "largest payment processor and money transfer system," serving "millions" of people around the world, including the United States.   At no time, however, did LIBERTY RESERVE register with the United States Department of the Treasury as a money transmitting business.

2.   ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, was the principal founder of LIBERTY RESERVE.   At all relevant times, BUDOVSKY directed and supervised LIBERTY RESERVE's operations, finances, and corporate strategy.

3.   VLADIMIR KATS, a/k/a "Ragnar," the defendant, was a co-founder of LIBERTY RESERVE.   KATS helped direct LIBERTY RESERVE until he left the company over a dispute with ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, in or about 2009.   KATS has also run multiple LIBERTY RESERVE "exchanger" services.

4.   AHMED YASSINE ABDELGHANI, a/k/a "Alex," the defendant, managed the day-to-day operations of LIBERTY RESERVE from in or about 2006 through in or about 2009, when he too left the company over a dispute with ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant.

5.   ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia,"
the defendant, replaced AHMED YASSINE ABDELGHANI, a/k/a "Alex,"
the defendant, as the manager of LIBERTY RESERVE's day-to-day
operations.   HIDALGO has also been a part-owner of LIBERTY
RESERVE since in or about 2010.

6.   AZZEDDINE EL AMINE, the defendant, has, since in or
about 2010, served as a principal deputy to ARTHUR BUDOVSKY,
a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant.   He
has managed various financial accounts controlled by LIBERTY
RESERVE and operated a prominent LIBERTY RESERVE "exchanger"
service, from which he has shared the profits with BUDOVSKY.

7.   MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," the
defendant, and MAXIM CHUKHAREV, the defendant, were associates
of ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," and were principally responsible for designing and
maintaining LIBERTY RESERVE's technological infrastructure.

<u>OVERVIEW</u>

8.   ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," the defendant, and his co-conspirators, intentionally
created, structured, and operated LIBERTY RESERVE as a criminal
business venture, one designed to help criminals conduct illegal
transactions and launder the proceeds of their crimes.   The
defendants deliberately attracted and maintained a customer base
of criminals by making financial activity on LIBERTY RESERVE

anonymous and untraceable.  The defendants also protected the criminal infrastructure they created by, among other things, lying to anti-money laundering authorities in Costa Rica, pretending to shut down LIBERTY RESERVE after learning the company was being investigated by U.S. law enforcement (only to continue operating the business through a set of shell companies), and moving tens of millions of dollars through shell-company accounts maintained in Cyprus, Russia, Hong Kong, China, Morocco, Spain, and Australia, among other places.

9.   Through the defendants' efforts, LIBERTY RESERVE has emerged as one of the principal means by which cyber-criminals around the world distribute, store, and launder the proceeds of their illegal activity.  Indeed, LIBERTY RESERVE has become a financial hub of the cyber-crime world, facilitating a broad range of online criminal activity, including credit card fraud, identity theft, investment fraud, computer hacking, child pornography, and narcotics trafficking.

10.  Because virtually all of LIBERTY RESERVE's business derived from suspected criminal activity, the scope of the defendants' unlawful conduct is staggering.  Estimated to have had more than one million users worldwide, with more than 200,000 users in the United States, LIBERTY RESERVE processed more than 12 million financial transactions annually, with a combined value of more than $1.4 billion.  Overall, from 2006 to

May 2013, LIBERTY RESERVE processed an estimated 55 million separate financial transactions and is believed to have laundered more than $6 billion in criminal proceeds.

### THE FOUNDING OF LIBERTY RESERVE

11.   LIBERTY RESERVE, as currently constituted, was born out of the defendants' unsuccessful experience running a third-party exchange service for another digital currency. Specifically, in or about 2006, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," and VLADIMIR KATS, a/k/a "Ragnar," the defendants, operated a company called "Gold Age, Inc.," which functioned as an "exchanger" for "E-Gold," then the most popular digital currency in operation.  However, in December 2006, BUDOSVKY and KATS were convicted in New York State of operating "Gold Age, Inc." as an unlicensed money transmitting business.  At or about the same time, E-Gold and several of its principals were charged with various offenses including money laundering.

12.   In the wake of his criminal conviction, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, set about building a digital currency that would succeed in eluding law enforcement where E-Gold had failed, by, among other ways, locating the business outside the United States.  Accordingly, BUDOVSKY emigrated to Costa Rica, where, in 2006, he and AHMED YASSINE ABDELGHANI, a/k/a "Alex," the

defendant, had incorporated LIBERTY RESERVE.  Working at first

principally with YASSINE and VLADIMIR KATS, a/k/a "Ragnar," the

defendant, BUDOVSKY devoted himself to building and expanding

LIBERTY RESERVE so that the company could profit from attracting

more and more criminal customers, all while seeking to evade the

scrutiny and reach of U.S. law enforcement authorities.

13.  LIBERTY RESERVE thereupon grew exponentially, filling

the void left by E-Gold and becoming the predominant digital

form of money laundering used by cyber-criminals worldwide.  By

in or about 2011, BUDOVSKY was so committed to evading U.S. law

enforcement that he formally renounced his U.S. citizenship and

became a Costa Rican citizen, telling U.S. immigration

authorities that he was concerned that the "software" his

"company" was developing "might open him up to liability in the

U.S."

### THE CRIMINAL DESIGN OF LIBERTY RESERVE

14.  To use LIBERTY RESERVE's digital currency, commonly

referred to as "LR," a user first was required to open an

account through the LIBERTY RESERVE website.  In registering,

the user was required to provide basic identifying information,

such as name, address, and date of birth.  However, unlike

traditional banks or legitimate online payment processors,

LIBERTY RESERVE did not require users to validate their identity

information, such as by providing official identification

documents or a credit card. Accounts could therefore be opened easily using fictitious or anonymous identities.

15. Once a user established an account with LIBERTY RESERVE, the user could then conduct transactions with other LIBERTY RESERVE users. That is, the user could receive transfers of LR from other users' accounts, and transfer LR from his own account to other users – including any "merchants" that accepted LR as payment. LIBERTY RESERVE charged a one-percent fee every time a user transferred LR to another user through the LIBERTY RESERVE system. In addition, for an additional "privacy fee" of 75 cents per transaction, a user could hide his own LIBERTY RESERVE account number when transferring funds, effectively making the transfer completely untraceable, even within LIBERTY RESERVE's already opaque system.

16. To add an additional layer of anonymity, LIBERTY RESERVE did not permit users to fund their accounts by transferring money to LIBERTY RESERVE directly, such as by issuing a credit card payment or wire transfer to LIBERTY RESERVE. Nor could LIBERTY RESERVE users withdraw funds from their accounts directly, such as through an ATM withdrawal. Instead, LIBERTY RESERVE users were required to make any deposits or withdrawals through the use of third-party "exchangers," thus enabling LIBERTY RESERVE to avoid collecting any information about its users through banking transactions or

other activity that would leave a centralized financial paper
trail.

17.  LIBERTY RESERVE's "exchangers" were third-party
entities that maintained direct financial relationships with
LIBERTY RESERVE, buying and selling LR in bulk from LIBERTY
RESERVE in exchange for mainstream currency.  The exchangers in
turn bought and sold this LR in smaller transactions with end
users in exchange for mainstream currency.  Thus, in order to
fund a LIBERTY RESERVE account, a user was required to transmit
mainstream currency in some fashion (through a money remitter,
for example) to an exchanger.  Upon receiving the user's
payment, the exchanger credited the user's LIBERTY RESERVE
account with a corresponding amount of LR, by transferring LR
from the exchanger's LIBERTY RESERVE account to the user's
account.  Similarly, if a LIBERTY RESERVE user wished to
withdraw funds from his account, the user was required to
transfer LR from his LIBERTY RESERVE account to an exchanger's
LIBERTY RESERVE account, and the exchanger then made
arrangements to provide the user a corresponding amount of
mainstream currency.

18.  The LIBERTY RESERVE website recommended a number of
"pre-approved" exchangers.  These exchangers tended to be
unlicensed money transmitting businesses operating without
significant governmental oversight or regulation, concentrated

in Malaysia, Russia, Nigeria, and Vietnam.   The exchangers charged transaction fees for their services, typically amounting to five percent or more of the funds being exchanged.   Such fees were much higher than those charged by mainstream banks or payment processors for comparable money transfers.

## THE CRIMINAL USE OF LIBERTY RESERVE

19.   As set forth above, LIBERTY RESERVE's system was designed so that criminals could effect financial transactions under multiple layers of anonymity and thereby avoid apprehension by law enforcement.   Not surprisingly, LIBERTY RESERVE was in fact used extensively for illegal purposes, functioning in effect as the bank of choice for the criminal underworld.   LIBERTY RESERVE users routinely established accounts under false names – including such blatantly criminal monikers as "Russia Hackers" and "Hacker Account."   Believing themselves to be protected by this anonymity, LIBERTY RESERVE users then engaged in criminal transactions with an impunity that would have been impossible in the legitimate financial system.

20.   To further enable the use of LIBERTY RESERVE for criminal activity, its website offered a "shopping cart interface" that "merchant" websites could use to accept LR currency as a form of payment.   The "merchants" who accepted LR currency were overwhelmingly criminal in nature.   They included,

for example: traffickers of stolen credit card data and personal identity information; peddlers of various types of online Ponzi and get-rich-quick schemes; computer hackers for hire; unregulated gambling enterprises; and underground drug-dealing websites.

21. In addition to being used to process payments for illegal goods and services online, LIBERTY RESERVE was also used by cyber-criminals to launder criminal proceeds and transfer funds among criminal associates. LIBERTY RESERVE was used by credit-card theft and computer-hacking rings operating in countries around the world, including Vietnam, Nigeria, Hong Kong, China, and the United States, to distribute proceeds of these conspiracies among the members involved.

22. The defendants were well aware that LIBERTY RESERVE functioned as an unlawful money-laundering enterprise. Indeed, in an online chat that was captured by law enforcement between VLADIMIR KATS, a/k/a "Ragnar," and AHMED YASSINE ABDELGHANI, a/k/a "Alex," KATS explicitly described LIBERTY RESERVE's activities as "illegal" and noted that "everyone in USA" such as "DOJ" knows "LR is [a] money laundering operation that hackers use."

## EFFORTS TO CONCEAL LIBERTY RESERVE'S OPERATIONS AND ASSETS

23. Throughout its operation, LIBERTY RESERVE and its principals sought to thwart effective regulation by anti-money

laundering authorities and to evade the reach of law
enforcement.

24. For example, in or about 2009, a Costa Rican agency
responsible for regulating financial institutions, known as
Superintendencia General de Entidades Financieras ("SUGEF"),
determined that LIBERTY RESERVE fell within its jurisdiction and
notified the company that it needed to apply for a license to
operate as a money transmitting business in Costa Rica.
Beginning in or about October 2009, LIBERTY RESERVE sought such
a license from SUGEF, but SUGEF refused to grant the application
based on concerns that LIBERTY RESERVE did not have even basic
anti-money laundering controls in place such as "know your
customer" procedures, and otherwise lacked any effective means
of tracking suspicious activity within its system.

25. Instead of remedying these deficiencies, LIBERTY
RESERVE created a system designed to feign compliance with anti-
money laundering procedures.  Specifically, ARTHUR BUDOVSKY,
a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," ALLAN ESTEBAN
HIDALGO JIMENEZ, a/k/a "Allan Garcia," MARK MARMILEV, a/k/a
"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the
defendants, created a computer portal that appeared to give
Costa Rican regulators the ability to access LIBERTY RESERVE
transactional information and monitor it for suspicious
activity.  However, the data that appeared in the portal was,

according to internal communications between the defendants,
mostly "fake" and could be manipulated to hide data that LIBERTY
RESERVE did not want regulators to see.

26.   By November 2011, LIBERTY RESERVE had still been
unable to obtain a license from SUGEF to operate legally in
Costa Rica.  Compounding the company's troubles, on or about
November 18, 2011, the U.S. Department of the Treasury's
Financial Crimes Enforcement Network ("FinCEN") issued a notice
to financial institutions within its network of the risks
associated with providing financial services to LIBERTY RESERVE.
The notice stated, among other things, that: "[i]nformation
obtained by the United States Department of the Treasury
indicates LIBERTY RESERVE is . . . currently being used by
criminals to conduct anonymous transactions to move money
globally."

27.   LIBERTY RESERVE obtained a copy of the FinCEN notice.
Approximately two weeks after the FinCEN notice was issued,
LIBERTY RESERVE falsely informed SUGEF that its business had
been sold to a foreign company and would no longer be operating
in Costa Rica.  LIBERTY RESERVE thus withdrew its application
for a money-transmitting license from SUGEF and purported to
shut down its office in Costa Rica.  In reality, however,
LIBERTY RESERVE went underground and continued to operate in
Costa Rica using a stripped-down staff working out of office

space held in the name of shell companies controlled by ARTHUR
BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the
defendant.

28. At or about the same time LIBERTY RESERVE falsely
informed SUGEF that it was shutting down its operations in Costa
Rica, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," and
AZZEDDINE EL AMINE, the defendants, began emptying LIBERTY
RESERVE's bank accounts in Costa Rica of millions of dollars and
transferring the money first to a bank account in Cyprus held in
the name of a shell company controlled by BUDOVSKY and EL AMINE,
and then to a bank account in Russia held in the name of another
shell company.

29. Shortly after the defendants began emptying LIBERTY
RESERVE's bank accounts in Costa Rica, the Costa Rican
government was able to seize approximately $19.5 million in
Costa Rican bank accounts maintained by LIBERTY RESERVE pursuant
to a request by U.S. law enforcement authorities.  Following
that seizure, BUDOVSKY, HIDALGO, and EL AMINE sought to evade
further seizure action by moving LIBERTY RESERVE funds into more
than two dozen shell-company accounts held in locations around
the world, including Cyprus, Hong Kong, China, Morocco,
Australia, and Spain.

## STATUTORY ALLEGATIONS

30.   From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i).

31.   It was a part and an object of the conspiracy that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial

transactions, which in fact involved the proceeds of specified unlawful activity, to wit, identity theft, access device fraud, computer hacking, wire fraud, child pornography, and narcotics trafficking, in violation of Title 18, United States Code, Sections 1028, 1029, 1030, 1343, and 2252, and Title 21, United States Code, Section 841, respectively, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

32.  It was further a part and an object of the conspiracy that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from places in the United States to and through places outside the United States, and to places in the United States from and through places outside the United States, knowing that the monetary instruments and funds involved in the transportation,

transmissions, and transfers represented the proceeds of some
form of unlawful activity, and knowing that such transportation,
transmissions, and transfers were designed in whole and in part
to conceal and disguise the nature, the location, the source,
the ownership, and the control of the proceeds of specified
unlawful activity, to wit, identity theft, access device fraud,
computer hacking, wire fraud, child pornography, and narcotics
trafficking, in violation of Title 18, United States Code,
Sections 1028, 1029, 1030, 1343, and 2252, and Title 21, United
States Code, Section 841, respectively, in violation of Title
18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO

(Conspiracy to Operate Unlicensed Money Transmitting Business)

The Grand Jury further charges:

### BACKGROUND

33.  The allegations contained in paragraphs 1 through 29
of this Indictment are repeated and realleged as if fully set
forth herein.

34.  Title 18, United States Code, Section 1960 makes it a
crime to operate an unlicensed money transmitting business.  The
statute was enacted in 1992 in order "to combat the growing use
of money transmitting businesses to transfer large amounts of
the monetary proceeds of unlawful enterprises."

35.   The term "money transmitting" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

36.   Under Title 18, United States Code Section 1960, it is a felony to conduct a "money transmitting business" if, among other things, the business is not registered as a money transmitting business with the Secretary of the Treasury as required under Title 31, United States Code, Section 5330 or regulations prescribed thereunder, or if the business otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity. See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).

37.   The implementing regulations for Title 31, United States Code, Section 5330 specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.   See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).  As noted above, LIBERTY RESERVE is estimated to have had approximately 200,000 users located in the United States, and at no time did LIBERTY RESERVE register with the United States Department of Treasury as a money transmitting business.

STATUTORY ALLEGATIONS

38.  From in or about 2006, up to and including in or about

May 2013, in the Southern District of New York and elsewhere,

LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk,"

a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE

ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a

"Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a

"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the

defendants, and others known and unknown, willfully and

knowingly did combine, conspire, confederate, and agree together

and with each other to operate an unlicensed money transmitting

business, in violation of Title 18, United States Code, Sections

1960(b)(1)(B) and 1960(b)(1)(C).

39.  It was a part and an object of the conspiracy that

LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk,"

a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE

ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a

"Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a

"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the

defendants, and others known and unknown, would and did conduct,

control, manage, supervise, direct, and own all and part of a

money transmitting business affecting interstate and foreign

commerce, to wit, LIBERTY RESERVE, which (i) failed to comply

with the money transmitting business registration requirements

set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been derived from a criminal offense and intended to be used to promote and support unlawful activity.

OVERT ACT

40.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a.    From on or about November 29, 2011, up to and including on or about December 6, 2011, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, caused a series of wire transfers, totaling approximately $13.5 million, to be made from Costa Rican bank accounts held by LIBERTY RESERVE, the defendant, through a correspondent bank account in the Southern District of New York, to a shell-company bank account in Cyprus controlled by AZZEDDINE EL AMINE, the defendant.

(Title 18, United States Code, Section 371.)

## COUNT THREE

(Operation of an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

41.   The allegations contained in paragraphs 1 through 29 and 34 through 37 of this Indictment are repeated and realleged as if fully set forth herein.

42.   From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of a money transmitting business affecting interstate and foreign commerce, to wit, LIBERTY RESERVE, which (i) failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been

derived from a criminal offense and intended to be used to promote and support unlawful activity.

(Title 18, United States Code, Sections 1960 & 2.)

## FORFEITURE ALLEGATION

43.  As a result of committing one or more of the offenses alleged in Counts One and Three of this Indictment, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in the offenses and all property traceable to such property, including but not limited to:

a.  A sum of money of at least $6 billion in United States currency;

b.  All funds on deposit in the following accounts:

i.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527143, held in the name of LIBERTY RESERVE Sociedad Anonima;

ii.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527141, held in the name of LIBERTY RESERVE Sociedad Anonima;

iii.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527144, held in the name of LIBERTY RESERVE Sociedad Anonima;

iv.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 302-301-302107678, held in the name of LIBERTY RESERVE Sociedad Anonima;

v.  Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301217563, held in the name of LIBERTY RESERVE Sociedad Anonima;

vi.  Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301218849, held in the name of LIBERTY RESERVE Sociedad Anonima;

vii.  Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301218988, held in the name of LIBERTY RESERVE Sociedad Anonima;

viii.  Banco Lafise (Costa Rica) Account No. 110024084, held in the name of LIBERTY RESERVE Sociedad Anonima;

ix.  Banco Nacional (Costa Rica) Account No. 100021546003625, held in the name of Worldwide E-Commerce Business S.A.;

x.  Banco BAC San Jose (Costa Rica) Account No. 912049962, held in the name of Grupo Lulu;

xi.  Hellenic Bank (Cyprus) Account No. 240-07-576000-01, held in the name of Ediago Holding Limited;

xii.  Hellenic Bank (Cyprus) Account No. 240-07-510618-01, held in the name of Serpentino LTD.;

xiii.  Hellenic Bank (Cyprus) Account No. 240-01-510618-01, held in the name of Serpentino LTD.;

xiv.  Hellenic Bank (Cyprus) Account No. 240-07-510619-01, held in the name of Oriata Limited;

xv.  Hellenic Bank (Cyprus) Account No. 240-01-510619-01, held in the name of Oriata Limited;

xvi.    Hellenic Bank (Cyprus) Account No. 240-01-510649-01, held in the name of Arthur Budovsky;

xvii.   Hellenic Bank (Cyprus) Account No. 240-07-510649-01, held in the name of Arthur Budovsky;

xviii.  Hellenic Bank (Cyprus) Account No. 240-01-521212-01, held in the name of Travertine LTD;

xix.    Hellenic Bank (Cyprus) Account No. 240-01-521214-01, held in the name of Marania Limited;

xx.     Hellenic Bank (Cyprus) Account No. 240-07-539613-01, held in the name of Makelina Limited;

xxi.    Hellenic Bank (Cyprus) Account No. 240-01-539613-01, held in the name of Makelina Limited;

xxii.   Hellenic Bank (Cyprus) Account No. 240-07-540249-01, held in the name of Allan Esteban Hidalgo Jimenez;

xxiii.  Hellenic Bank (Cyprus) Account No. 240-07-568225-01, held in the name of Azzeddine El Amine;

xxiv.   Hellenic Bank (Cyprus) Account No. 240-01-568225-01, held in the name of Azzeddine El Amine;

xxv.    Hellenic Bank (Cyprus) Account No. 240-01-438977-02, held in the name of Elano Consulting Limited;

xxvi.   Hellenic Bank (Cyprus) Account No. CY09005002400002400741184302, held in the name of Phaerman Management Limited;

xxvii.  Hellenic Bank (Cyprus) Account No. CY58005002400002400753771401, held in the name of Manueta Limited;

xxviii. National Bank of Greece (Cyprus) Account No. CY5200600550000000005507935079, held in the name of Sandstein Limited;

xxix. National Bank of Greece (Cyprus) Account No. CY9700600550000000005507935239, held in the name of Ediago Holdings Ltd.;

xxx. Cyprus Development Bank P.C. (Cyprus) Account No. CY45014002010101010005029010, held in the name of Unida Limited;

xxxi. EuroBank EFG (Cyprus) Account No. 201100040131, held in the name of Sandstein Limited;

xxxii. EuroBank EFG (Cyprus) Account No. 201100040140, held in the name of Fleureen Limited;

xxxiii. Sovetsky Bank Zao (Russia) Account No. 40702978700110001548, held in the name of Olymp-47 LLC;

xxxiv. Bank of Communications (Hong Kong) Account No. 532-9-312438-5, held in the name of Extension Asia Limited;

xxxv. Shenzhen Bank (China) Account No. 11012870675701, held in the name of Extension Asia Limited;

xxxvi. Attijariwafa Bank (Morocco) Account No. MA00781000044670004100 1887, held in the name of Arthur B. Belanchuk;

xxxvii. Attijariwafa Bank (Morocco) Account No. MA00781000044650004 6028825, held in the name of Azzeddine El Amine;

xxxviii. Banque Marocaine de Commerce Exterieur (Morocco) Account No. MA01178000004820500 0892589, held in the name of Ahmed Yassine;

xxxix. Banque Marocaine de Commerce Exterieur (Morocco) Account No.

MA01178000004849600089 2395, held in the name of Kelsin Antonio Varela Figueroa;

xl.   Barclay's Bank (Spain) Account No. ES5300651157130021000973, held in the name of Arthur Budovsky;

xli.  Rietumu Bank (Latvia) Account No. LV69 RTMB 0000608806731, held in the name of Robix Services Inc.; and

xlii. SunTrust Bank Account No. 1000049971780, held in the name of Webdata Inc.;

c.   Up to $36,919,884 on deposit in the following

accounts:

i.    Westpac Bank (Australia) Account No. 034702289721, held in the name of Technocash Ltd.;

ii.   Westpac Bank (Australia) Account No.034705205706, held in the name of Technocash Ltd.;

iii.  Westpac Bank (Australia) Account No. 034702807875, held in the name of Technocash Ltd.; and

d.   The following domain names:

i.    LIBERTYRESERVE.COM;

ii.   EXCHANGEZONE.COM;

iii.  SWIFTEXCHANGER.COM;

iv.   MONEYCENTRALMARKET.COM;

v.    ASIANAGOLD.COM; and

vi.   EUROGOLDCASH.COM.

SUBSTITUTE ASSET PROVISION

44.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

(Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853.)

FOREPERSON

PREET BHARARA
United States Attorney

JAIKUMAR RAMASWAMY
Chief, Asset Forfeiture and
Money Laundering Section, Criminal
Division, United States
Department of Justice

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LIBERTY RESERVE, S.A.,
ARTHUR BUDOVSKY, a/k/a "Arthur
Belanchuk," a/k/a "Eric Paltz,"
VLADIMIR KATS, a/k/a "Ragnar,"
AHMED YASSINE ABDELGHANI, a/k/a "Alex,"
ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a
"Allan Garcia,"
AZZEDDINE EL AMINE,
MARK MARMILEV, a/k/a "Marko," a/k/a
"Mark Halls," and
MAXIM CHUKHAREV

INDICTMENT

13 Cr.

(18 U.S.C. §§ 1956, 371, 1960 & 2)

Foreperson.                      PREET BHARARA
                        United States Attorney.

# EXHIBIT B

AO 93 (SDNY Rev. 05/10) Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No.: 13 Crim. 368 (DLC) |
| - v. - | ) | |
| | ) | |
| LIBERTY RESERVE S.A., ET AL. | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property be seized as being subject to forfeiture to the United States of America.   The property is described as follows:

1.      The domain name LIBERTYRESERVE.COM;
2.      the domain name EXCHANGEZONE.COM;
3.      the domain name SWIFTEXCHANGER.COM;
4.      the domain name MONEYCENTRALMARKET.COM; and
5.      the domain name ASIANAGOLD.COM.

(the "DOMAIN NAMES").

I find that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(e) and (f).

**YOU ARE COMMANDED** to execute this warrant and seize the property so described on or before _June 5, 2013_
*(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.   ☑ at any time in the day or night as I find reasonable cause has been established.

The DOMAIN NAMES' registry, VeriSign, Inc., 12061 Bluemont Way, Reston, VA 20190, shall be directed to comply with all terms of this warrant by locking and seizing the DOMAIN NAMES pursuant to the conditions set out in Exhibit A hereto pending further order of the Court.

The United States Secret Service or its designee is directed to maintain custody of the property pending resolution of the forfeiture.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory of any property seized and promptly return this warrant and inventory to the Clerk of the Court.

☑ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _dlc_.
*USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for   21   days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of. _____ .

Date and time issued:   May 23 , 2013 ⟩ 05 p.m.

City and State:   New York, New York _____

_____
*Judge's signature*
Honorable Denise L. Cote
United States District Judge
Southern District of New York

AO 93 (Rev. 01/09) (Modified) Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____                      _____
                                         *Executing officer's signature*

                                           _____
                                           *Printed name and title*

## EXHIBIT A

I.    Seizure Procedure

     A.    The seizure warrant will be presented in person or transmitted via facsimile or email to personnel of the domain name registry listed in section II (the "Subject Registry"). The Subject Registry will be directed, for the domain names listed in section III (the "Subject Domain Names") for which it serves as the top-level domain registry, to make any changes necessary to restrain and lock the Subject Domain Names pending transfer of all rights, title, and interest in the Subject Domain Names to the United States upon completion of forfeiture proceedings.

     B.    Upon seizure of the Subject Domain Names, the Subject Registry will coordinate with the United States Secret Service ("USSS") to execute the following two-step process:

     1.    On the date and at the time specified by the USSS, or as soon as practicable thereafter, the Subject Registry shall change the Subject Domain Names to the following new authoritative nameservers:

          ns1.sinkhole.shadowserver.org (IP address 74.208.64.145)
          ns2.sinkhole.shadowserver.org (IP address 74.208.15.160)

     2.    At a subsequent date and time, the Government will display a notice on website(s) hosted on server(s) assigned IP address(es) to which the nameservers identified above will resolve the Subject Domain Names, consisting of law enforcement emblems and the following text (or substantially similar text):

          This domain name has been seized by the
          United States Global Illicit Financial Team,
          in accordance with a seizure warrant
          obtained by the United States Attorney's
          Office for the Southern District of New
          York and issued pursuant to 18 U.S.C. §
          982(a)(1) by the United States District Court
          for the Southern District of New York.

C.    The Subject Registry is directed to take all steps necessary to lock the Subject Domain Names at the registry level to ensure that changes to the Subject Domain Names cannot be made absent court order or, if forfeited to the United States, without prior consultation with the USSS.

II.    Subject Registry

VeriSign, Inc.
12061 Bluemont Way
Reston, VA 20190

III.    Subject Domain Names

LIBERTYRESERVE.COM
EXCHANGEZONE.COM
SWIFTEXCHANGER.COM
MONEYCENTRALMARKET.COM
ASIANAGOLD.COM

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                    :

UNITED STATES OF AMERICA            :

              - v. -                :    UNDER SEAL

LIBERTY RESERVE S.A.,               :    DECLARATION OF SPECIAL
ARTHUR BUDOVSKY,                         AGENT TATE A. JARROW IN
     a/k/a "Arthur Belanchuk,"      :    SUPPORT OF EX PARTE
     a/k/a "Eric Paltz,"                 APPLICATION FOR POST-
VLADIMIR KATS,                      :    INDICTMENT RESTRAINING
     a/k/a "Ragnar,"                     ORDER, SEIZURE WARRANT AND
AHMED YASSINE ABDELGHANI,           :    INJUNCTION PURSUANT TO
     a/k/a "Alex,"                       21 U.S.C. § 853(e) and (f)
ALLAN ESTEBAN HIDALGO JIMENEZ,      :
     a/k/a "Allan Garcia,"
AZZEDDINE EL AMINE,                 :
MARK MARMILEV,                           13 Cr. 368 (DLC)
     a/k/a "Marko," and             :
MAXIM CHUKHAREV,
                                    :
              Defendants.
                                    :
- - - - - - - - - - - - - - - - x

STATE OF NEW YORK            )
COUNTY OF NEW YORK           : ss.:
SOUTHERN DISTRICT OF NEW YORK )

          TATE A. JARROW deposes and says:

                        INTRODUCTION

          1.   I have been a Special Agent with the United States

Secret Service ("USSS") for over three years.  Since early 2011,

I have been assigned to the Electronic Crimes Task Force at the

USSS's New York Field Office.  During this time I have been

involved in numerous investigations into various types of online

criminal activity, including, for example, identity theft, access

device fraud, and wire fraud.  I am familiar with how such

criminal activity is commonly conducted and with how the proceeds from such criminal activity are commonly laundered.

2.   I am familiar with the information contained in this declaration based on my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and civilian witnesses.  Because this declaration is being submitted for the limited purpose of establishing probable cause to obtain a restraining order, a seizure warrant, and an injunction, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.   This declaration is submitted for three purposes, as set forth in the Government's ex parte application (the "Application").  First, it is submitted in support of the Government's ex parte application, pursuant to Title 21, United States Code, Section 853(e), for the issuance of a post-indictment order (the "Restraining Order") restraining LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," and MAXIM CHUKHAREV, the defendants, and others from engaging in

the transfer, sale, assignment, pledge, hypothecation, encumbrance, dissipation, distribution or movement of the contents of the following bank accounts:

    a.    Hellenic Bank (Cyprus) Account No. 240-07-539613-01, held in the name of Makelina Limited;

    b.    Hellenic Bank (Cyprus) Account No. 240-01-539613-01, held in the name of Makelina Limited;

    c.    Hellenic Bank (Cyprus) Account No. 240-07-540249-01, held in the name of Allan Esteban Hidalgo Jimenez;

    d.    Hellenic Bank (Cyprus) Account No. 240-01-438977-02, held in the name of Elano Consulting Limited;

    e.    Hellenic Bank (Cyprus) Account No. CY09005002400002400741184302, held in the name of Phaerman Management Limited;

    f.    Hellenic Bank (Cyprus) Account No. CY58005002400002400753771401, held in the name of Manueta Limited;

    g.    National Bank of Greece (Cyprus) Account No. CY52006005500000005507935079, held in the name of Sandstein Limited;

h.   National Bank of Greece (Cyprus) Account No.
CY9700600550000005507935239, held in the name of
Ediago Holdings Ltd.;

i.   Cyprus Development Bank P.C. (Cyprus) Account No.
CY4501400201010101010005029010, held in the name of
Unida Limited;

j.   EuroBank EFG (Cyprus) Account No. 201100040131,
held in the name of Sandstein Limited;

k.   EuroBank EFG (Cyprus) Account No.  201100040140,
held in the name of Fleureen Limited;

l.   Rietumu Bank (Latvia) Account No. LV69 RTMB
0000608806731, held in the name of Robix Services
Inc.;

m.   SunTrust Bank Account No. 1000049971780, held in
the name of Webdata Inc.;

n.   Banco Nacional (Costa Rica) Account No.
100021546003625, held in the name of Worldwide E-
Commerce Business S.A.; and

o.   Banco BAC San Jose (Costa Rica) Account No.
912049962, held in the name of Grupo Lulu;

(collectively, the "Target Accounts").  Because funds in many of
these accounts can be quickly and easily transferred, the
requested Restraining Order is necessary and essential to
preserve these assets pending the resolution of this matter.

4

Without such an Order, these funds could be quickly dissipated or concealed.

4.     Second, this declaration is submitted in support of the Government's ex parte application, pursuant to Title 21, United States Code, Section 853(e) and (f), for the issuance of a warrant (the "Seizure Warrant") to seize and forfeit the following domain names:

a.     The domain name LIBERTYRESERVE.COM, registered through AB Name ISP, Radiovagen 2, Teknikhuset, 421 47 Vastra Frolunda, Sweden;

b.     the domain name SWIFTEXCHANGER.COM, registered through GODADDY.COM, 14455 North Hayden Road, Suite 226, Scottsdale, AZ 85260;

c.     the domain name MONEYCENTRALMARKET.COM, registered through GODADDY.COM, 14455 North Hayden Road, Suite 226, Scottsdale, AZ 85260;

d.     the domain name ASIANAGOLD.COM, registered through CRYSTALTECH WEB HOSTING INC., 1904 W. Parkside Lane, 2nd Floor, Phoenix, AZ 85027; and

e.     the domain name EXCHANGEZONE.COM, registered through INTERNET.BS CORP, Sea Beach Boulevard, Sea Beach Estates N-4892 Nassau, The Bahamas;

(collectively, the "Domain Names"). The procedure by which the Government will seize the Domain Names, including redirecting

5

traffic to another website notifying users of the seizures, is described in Exhibit O to the Application.

     5.    Third, this declaration is submitted in support of the Government's ex parte application, pursuant to Title 21, United States Code, Section 853(e), for the issuance of an injunction (the "Injunction") enjoining Amazon Web Services, Inc. from providing services to support the LIBERTYRESERVE.COM website.  Such an Injunction is required, in addition to the Seizure Warrant, in order to facilitate the seizure of the Liberty Reserve domain name, in case law enforcement is not able to seize the underlying servers for the Liberty Reserve website at the time of the coordinated international takedown, scheduled to begin on May 24, 2013.  If underlying servers are not immediately seized by authorities in Switzerland and Costa Rica, users could bypass the domain name seizure and access the Liberty Reserve website by finding its IP address through publicly available online tools and then typing that IP address directly into a web browser.

BACKGROUND

     6.    This application arises from an ongoing investigation concerning a company incorporated in Costa Rica, named "Liberty Reserve S.A." ("Liberty Reserve").  Through its website, www.libertyreserve.com, Liberty Reserve operates an international online digital currency service and money transfer

6

system.   As discussed below and in the Indictment, the Government's investigation has revealed that Liberty Reserve is extensively used by cybercriminals around the world for distributing, storing, and laundering the proceeds of their criminal activity.

## THE INVESTIGATION

7.   The investigation into Liberty Reserve began in the fall of 2011, and has been led by prosecutors from the U.S. Attorney's Office for the Southern District of New York and the Asset Forfeiture and Money Laundering Section of the Department of Justice, working with agents from the Global Illicit Financial Team ("GIFT") (an IRS-led task force targeting third-party, international money launderers), the United States Secret Service, and Homeland Security Investigations.

8.   In order to uncover the scope of Liberty Reserve's worldwide operation and the roles of the individuals behind it, the Government's investigation has required unprecedented international cooperation.   As described in more detail below, the Government has obtained seizure warrants for 28 bank accounts controlled by the Defendants, located in eight countries.   These warrants have already resulted in the seizure or restraint of approximately $20 million in assets.   The Government has issued more than 30 requests pursuant to Mutual Legal Assistance Treaties ("MLATs") to more than a dozen countries, including

7

multiple requests to Costa Rica, the Netherlands, Cyprus, and Australia, and additional requests to Canada, China, Hong Kong, Morocco, Spain, Switzerland, Sweden, Norway, Luxembourg, and Russia.

9.    In addition, agents working on the investigation have executed search warrants for more than 30 separate email and Internet accounts; installed more than two dozen pen registers on multiple phone and email accounts; reviewed hundreds of thousands of documents, including emails and bank records; set up undercover accounts and conducted undercover transactions; and also executed one of the first-ever "cloud"-based search warrants, directed to a service provider used to process Liberty Reserve's Internet traffic.  The prosecutors also obtained judicial authorization for a wiretap on the email account of one of the principal defendants in the case, and, pursuant to MLAT requests, the Netherlands conducted a wiretap on the cellphone and Internet connection of another of the principal targets in the case.

10.    Due to the extensive reach of Liberty Reserve's operations, the planned takedown in this case is expected to involve simultaneous law enforcement action by nine foreign countries, including, among other actions, arrests in Spain and Costa Rica; searches and seizures in Sweden, Switzerland, the Netherlands, Australia and Costa Rica; and asset freezes in Hong

Kong, Spain, Morocco and China.

## THE INDICTMENT

11.   On May 20, 2013, in connection with this investigation, a grand jury sitting in this District returned a three-count sealed indictment charging LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," and MAXIM CHUKHAREV, the defendants, with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One); conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §371 (Count Two); and operation of an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 2 (Count Three) (the "Indictment") See 13 Cr. 368 (DLC) (attached to the Application as Exhibit A and incorporated by reference).

12.   The Indictment includes forfeiture allegations providing notice that the Government is seeking forfeiture, pursuant to 18 U.S.C. § 982(a)(1), of any property involved in the offenses alleged in Counts One and Three of the Indictment, and any property traceable to such property, including, but not limited to, the Domain Names and the Target Accounts.

9

### The Defendants

13. As set forth in more detail in the Indictment, Liberty Reserve was incorporated in Costa Rica in 2006, and for years it has operated one of the world's most widely used digital currencies, through its website, www.libertyreserve.com. (Ind. ¶¶ 1, 2). Liberty Reserve has touted itself as the Internet's "largest payment processor and money transfer system," serving "millions" of people around the world, including in the United States. (Ind. ¶ 1). At no time, however, did Liberty Reserve register with the United States Department of the Treasury as a money transmitting business. (Id.).

14. Defendant Arthur Budovsky, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," ("Budovsky"), was the principal founder of Liberty Reserve and at all relevant times, has directed and supervised Liberty Reserve's operations, finances, and corporate strategy. (Ind. ¶ 2).

15. Defendant Vladimir Kats, a/k/a "Ragnar," was a co-founder of Liberty Reserve, and helped direct the company until he left over a dispute with Budovsky, in or about 2009. (Ind. ¶ 3).

16. Defendant Ahmed Yassine Abdelghani ("Yassine"), a/k/a "Alex," managed the day-to-day operations of Liberty Reserve from in or about 2006 through in or about 2009, when he too left the company over a dispute with Budovsky. (Ind. ¶ 4).

17.   Defendant Allan Esteban Hidalgo Jimenez ("Hidalgo"), a/k/a "Allan Garcia," replaced Yassine as the manager of Liberty Reserve's day-to-day operations, and has also been a part-owner of Liberty Reserve since in or about 2010. (Ind. ¶ 5).

18.   Defendant Azzeddine El Amine ("El Amine") has, since in or about 2010, served as a principal deputy to Budovsky, and has managed various financial accounts controlled by Liberty Reserve.  Additionally, as explained in more detail below, El Amine has operated a prominent Liberty Reserve "exchanger" service, the profits from which he has shared with Budovsky. (Ind. ¶ 6).

19.   Defendants Mark Marmilev, a/k/a "Marko," ("Marmilev") and Maxim Chukharev ("Chukharev") were associates of Budovsky and were principally responsible for designing and maintaining Liberty Reserve's technological infrastructure. (Ind. ¶ 7).  As set forth in more detail below, Marmilev has also operated a digital currency exchanger service related to Liberty Reserve, itself constituting a separate unlicensed money transmitting business in violation of 18 U.S.C. § 1960.

Overview of the Criminal Conduct

20.   As set forth in the Indictment, Budovsky and his co-conspirators intentionally created, structured, and operated Liberty Reserve as a far-flung criminal business venture, one designed to help criminals around the world conduct illegal

11

transactions and launder the proceeds of their crimes. (Ind. ¶ 8). The defendants deliberately attracted and maintained a customer base of criminals by making financial activity on Liberty Reserve anonymous and untraceable. (Id.) As word spread about Liberty Reserve on underground Internet forums and chat rooms, Liberty Reserve became a financial hub of the cyber-crime world, facilitating a broad range of online criminal activity, including credit card fraud, identity theft, investment fraud, computer hacking, child pornography, and narcotics trafficking. (Ind. ¶ 9).

21. The defendants also protected the criminal infrastructure they created by, among other things, lying to anti-money laundering authorities in Costa Rica, pretending to shut down Liberty Reserve after learning the company was being investigated by U.S. law enforcement (only to continue operating the business through a set of shell companies), and moving tens of millions of dollars through shell-company accounts maintained in Cyprus, Russia, Hong Kong, China, Morocco, Spain, and Australia, among other places. (Ind. ¶ 8).

22. Since virtually all of Liberty Reserve's business derived from suspected criminal activity, the scope of the defendants' unlawful conduct is staggering. (Ind. ¶ 10). Estimated to have had more than one million users worldwide, with more than 200,000 users in the United States, Liberty Reserve has

processed more than 12 million financial transactions annually, with a combined value of more than $1.4 billion. (Id.).  Overall, from 2006 through May 2013, Liberty Reserve processed an estimated 55 million separate financial transactions and is believed to have laundered more than $6 billion in criminal proceeds. (Id.).

The Role of Exchangers in
the Operation of Liberty Reserve

23.  During the time period relevant to the Indictment, Liberty Reserve's system has operated as follows.  To use Liberty Reserve's digital currency, commonly referred to as "LR," a user was required to open an account through the Liberty Reserve website.  (Ind. ¶14). Liberty Reserve did not require users to validate their identity information, and accounts could therefore be opened easily using fictitious or stolen identities.  (Id.)[1]

24.  Liberty Reserve did not permit users to add funds to, or withdraw funds from, their accounts directly.  (Ind. ¶16). Instead, Liberty Reserve users were required to make any deposits

---

[1]     As an example, in an undercover capacity, I opened a Liberty Reserve account using blatantly false information, including listing my name as "Joe Bogus" and my address as "123 Main Street, Completely Made Up City, New York." See Exhibit N to the Application, which is a screenshot of the account creation page on the Liberty Reserve website. I subsequently used this account to execute multiple undercover transactions on Liberty Reserve.  For instance, I transmitted hundreds of LR dollars between the "Joe Bogus" account and another undercover account with the following notes in the "memo" field: "your share of the cashout," "for atm skimming work," and "for the cocaine."

or withdrawals through the use of "exchangers."  These "exchangers" were third-party entities that maintained direct financial relationships with Liberty Reserve, buying and selling LR in bulk from Liberty Reserve in exchange for mainstream currency.  (Ind. ¶17).  The exchangers in turn bought and sold this LR in smaller transactions with end users in exchange for mainstream currency.  (Id.).  Thus, in order to fund a Liberty Reserve account, a user was required to transmit mainstream currency in some fashion (through a money remitter, for example) to an exchanger.  (Id.).  Upon receiving the user's payment, the exchanger credited the user's Liberty Reserve account with a corresponding amount of LR, by transferring LR from the exchanger's Liberty Reserve account to the user's account. (Id.).  Similarly, if a Liberty Reserve user wished to withdraw funds from his account, the user was required to transfer LR from his Liberty Reserve account to an exchanger's Liberty Reserve account, and the exchanger then made arrangements to provide the user a corresponding amount of mainstream currency.  (Id.).

25.  The Liberty Reserve website recommended a number of "pre-approved" exchangers  (Ind. ¶18), including AsianaGold, Swiftexchanger, and MoneyCentralMarket, which are discussed in more detail below.  These exchangers tended to be unlicensed money transmitting businesses operating without significant governmental oversight or regulation, concentrated in Malaysia,

14

Russia, Nigeria, and Vietnam. (Id.) The exchangers charged transaction fees for their services, typically amounting to five percent or more of the funds being exchanged – much higher than fees charged by mainstream banks or payment processors for comparable money transfers. (Id.)

## PRIOR SEIZURE WARRANTS FOR BANK ACCOUNTS

26. As previously stated, in the course of this investigation, the Government has obtained seizure warrants for 28 bank accounts that are owned or controlled by one or more of the defendants (the "Seized Accounts"). In connection with the seizure warrants, a number of United States Magistrate Judges in the Southern District of New York found that there existed probable cause to believe that the Seized Accounts were property involved in, or traceable to property involved in, money laundering offenses, and were therefore subject to criminal and civil forfeiture. The Seized Accounts are listed in the Forfeiture Allegations in the Indictment. The table below summarizes the seizure warrants that have been obtained to date, as well as the Magistrate Judge who issued each warrant. The warrants are attached to the Application as Exhibits C through M.

15

| Date | Case Number | Bank | Magistrate Judge |
|------|-------------|------|------------------|
| 3/21/12 | 12 Mag. 772 | Hellenic Bank Ltd. (Cyprus) | Fox |
| 3/21/12 | 12 Mag. 772(a) | Banco Lafise (Costa Rica) | Fox |
| 3/27/12 | 12 Mag. 772(b) | Banco Credito Agricola de Cartago (Costa Rica) | Pitman |
| 3/21/12 | 12 Mag. 772(c) | Grupo Mutual Alajuela (Costa Rica) | Fox |
| 5/10/12 | 12 Mag. 1240 | Sovetsky Bank Zao (Russia) | Fox |
| 2/5/13 | 13 Mag. 0324 | Hellenic Bank, Ltd. (Cyprus) | Freeman |
| 5/7/13 | 13 Mag. 1206 | Westpac Bank Corporation (Australia) | Gorenstein |
| 5/7/13 | 13 Mag. 1206(a) | Attijariwafa Bank (Morocco)<br><br>Banque Marocaine de Commerce Exterieur (Morocco) | Gorenstein |
| 5/7/13 | 13 Mag. 1206(b) | Shenzhen Development Bank (China) | Gorenstein |
| 5/7/13 | 13 Mag. 1206(c) | Barclays Bank (Spain) | Gorenstein |
| 5/7/13 | 13 Mag. 1206(d) | Bank of Communications Co., Ltd. (Hong Kong) | Gorenstein |

27.  The U.S. Government has submitted MLAT requests to the appropriate foreign countries to execute the previously-obtained seizure warrants.  These Seized Accounts are not the subject of the current application for a Restraining Order.

## ACCOUNTS SUBJECT TO PROPOSED RESTRAINING ORDER

28.  In addition to the Seized Accounts, described above, for which Seizure Warrants have already been obtained, the Forfeiture Allegations in the Indictment lists additional accounts that have not been previously seized or restrained, including the Target Accounts.

### The Cypriot Target Accounts

29.  From e-mails and financial records I have reviewed, I have learned that defendant Arthur Budovsky is using an Australian-based company called Technocash to receive funds from exchangers.  According to the Technocash website, Technocash specializes in business-to-business international transfers of funds.  Businesses sign up for an account with Technocash and receive a reference number.  When a business wants to receive funds, the business provides this reference number to the sender. Since Technocash itself is not a financial institution, the sender uses his bank to wire funds to Technocash's bank accounts located at Westpac Bank in Australia.  The sender includes the reference number in the memo section of the wire.  Technocash receives the wire and uses the reference number to credit the correct Technocash accountholder.  The accountholder can then wire funds to other Technocash accountholders or to a bank of his choice.

30.  From e-mails I have reviewed, I know that

17

defendant Azzeddine El Amine is the Technocash accountholder for Swiftexchanger.   The e-mails show that exchangers wishing to purchase Liberty Reserve currency wire funds to Swiftexchanger.[2] When Swiftexchanger receives funds in its Technocash account, an e-mail alert is sent to El Amine, notifying him of the transfer. Based on a review of these alerts sent to El Amine, I have determined that from June 12, 2012 to May 1, 2013, exchangers doing business with Liberty Reserve have sent approximately $36,919,884 to accounts held by Technocash at Westpac Bank in Australia.   On the basis of this information, the Government obtained a seizure warrant authorizing it to seize up to $36,919,884 in funds held at Westpac Bank in the name of Technocash Limited.

     31.   The following nine accounts that are the subject of this application are located in Cyprus and have received money directly from the Liberty Reserve-controlled accounts at Technocash:

     a.   Hellenic Bank account numbers 240-07-539613-01 and 240-01-539613-01, in the name of Makelina Limited.   The signatory on these accounts is defendant Allan Esteban Hidalgo Jimenez.   These accounts have received more than $1.4 million from Liberty Reserve's Technocash accounts.

---

    [2] Swiftexchanger is a Costa Rican company owned by Budovsky and El Amine that provides "exchanger" services for Liberty Reserve.

b.    Hellenic Bank account number 240-07-540249-01, in the name of Hidalgo.  This account has received approximately $34,000 from Liberty Reserve's Technocash accounts.

c.    Hellenic Bank account number 240-01-438977-02, in the name of Elano Consulting Limited.  This account received approximately 275,000 Euros from Liberty Reserve's Technocash accounts.

d.    Hellenic Bank account number CY09005002400002400741184302, in the name of Phaerman Management Limited.  This account received approximately $15,000 from Liberty Reserve's Technocash accounts.

e.    Hellenic Bank account number CY58005002400002400753771401, in the name of Manueta Limited.  This account received approximately $33,000 from Liberty Reserve's Technocash accounts.

f.    National Bank of Greece (Cyprus) account number CY52006005500000000550793 5079, in the name of Sandstein Limited.  This account, along with the account in the name of Sandstein Limited at Eurobank EFG Cyprus noted below, received a total of more than $14 million from Liberty Reserve's Technocash accounts.

g.    EuroBank EFG Cyprus account number 201100040131, in the name of Sandstein Limited.  This account,

19

along with the account in the name of Sandstein Limited at
National Bank of Greece (Cyprus) Ltd. noted above, received a
total of more than $14 million from Liberty Reserve's Technocash
accounts.

   h. EuroBank EFG Cyprus account number
201100040140, in the name of Fleureen Limited.  This account has
received more than $2.3 million in transfers from Liberty
Reserve's Technocash accounts.

   32. I have also learned of two additional bank
accounts in Cyprus that have received moneys directly traceable
to Liberty Reserve.  These accounts are as follows:

   a. National Bank of Greece (Cyprus) account
number CY97006005550000000550793 5239, in the name of Ediago
Holdings Ltd.  This account received approximately 219,000 Euros
from the Liberty Reserve account in Russia that had previously
received more than 10 million Euros from Liberty Reserve's
account in Cyprus.

   b. Cyprus Development Bank (Cyprus) account
number CY45014002010101010005029010, in the name of Unida
Limited.  This account received approximately 438,000 Euros from
the Liberty Reserve account in Russia that had previously
received more than 10 million Euros from Liberty Reserve's
account in Cyprus.

(the accounts in Paragraph 31(a)-(h) and Paragraph 32(a)-(b),

collectively, the "Cypriot Target Accounts").

33.   The United States submitted an MLAT request to Cyprus on or about April 9, 2013, in which it requested additional records for the Cypriot Target Accounts.  Based on the information transmitted in this MLAT request, the financial institutions holding the Cypriot Target Accounts voluntarily froze the Cypriot Target Accounts.

<u>The Latvian Target Account</u>

34.   According to bank account opening records I have reviewed, defendant Arthur Budovsky is the signatory on Hellenic Bank account 240-01-510619-01 in the name of Oriata Limited, which is subject to a previously-issued seizure warrant. Financial records I have reviewed show that Oriata Limited has received 312,605.57 Euros from Technocash.  Those records also show that from February 8, 2012 to April 26, 2012, Oriata Limited sent 1,150,000 Euros to a company by the name of Robix Services. The wire memos state: "Feb 3-12 Agreement Industrial Equipment." The records show that the funds were sent to Rietumu Bank Account number LV69 RTMB 0000 6088 0673 1 (the "Latvian Target Account").

35.   A search for "Robix Services" on the Internet yields no results for a company that sells industrial equipment. According to account opening documents from Hellenic Bank, the main activities of Oriata Limited are "Web promotion, advertising company."  Based on this description, it is unlikely that these

transfers were actually for the purchase of legitimate goods and services, namely industrial equipment. Given the prolific use of shell companies and the layering of Liberty Reserve funds orchestrated by Budovsky, I believe that the purpose of these transfers was to further distance these funds from being identified as proceeds of the criminal conduct of Liberty Reserve.

### The SunTrust Target Account

36. According to bank account opening records I have reviewed, defendant Arthur Budovsky is the signer on SunTrust bank account 1000049971780 in the name of Webdata Inc. (the "SunTrust Target Account"). According to New Hampshire public records, Budovsky is listed as the registered agent for Webdata Inc. A review of Technocash records show that deposits into the SunTrust Target Account from Technocash accounts associated with Liberty Reserve during the period April 2010 to November 2012 total more than $300,000.

### The Costa Rican Target Accounts

#### The WEBSA Account

37. Worldwide E-Commerce Business Sociedad Anonima (W.E.B.S.A. or "WEBSA"), was formed on February 6, 2008. According to Costa Rican official records, the president of WEBSA is listed as defendant Arthur Budovsky and its secretary is listed as defendant Maxim Chukharev. Our investigation has shown

that WEBSA is inextricably connected to Liberty Reserve and has two primary functions: to provide information technology support services to Liberty Reserve, and to serve as a vehicle for distributing Liberty Reserve profits to Liberty Reserve principals and employees.

38. For example, financial and billing records reviewed in this investigation show that WEBSA is the registered billing entity for Liberty Reserve's account with a web hosting service, and the payments recorded in Liberty Reserve's web hosting service payment history match withdrawals from WEBSA's account at Banco Nacional, Costa Rica, Account Number 154-600362-5 (the "WEBSA account"). More significantly, bank records indicate that from July 2010 to January 2013, the WEBSA account received more than $590,000 from the accounts at Technocash associated with Liberty Reserve that are described above.

39. As of December 2012, the WEBSA account had in it $21,720.85. Most of the payments from the WEBSA account were made to a second WEBSA account at Bancredito (the "WEBSA Bancredito account") that, based on my knowledge of Liberty Reserve and its principals and employees, was used to pay compensation to Liberty Reserve's officers and employees. For example, WEBSA paid Budovsky a salary of $2,500 per month from the WEBSA Bancredito account, and other payments were made to

23

other employees of Liberty Reserve working in Costa Rica.

The Grupo Lulu Account

40.   Grupo Lulu Limitada ("Grupo Lulu") was formed in April of 2009.  Its president is listed as defendant Arthur Budovsky (using Budovsky as his middle name, with the last name "Belanchuk").  According to its website, Grupo Lulu is a property management company.  However, records reviewed in the investigation and my training and experience indicate that Liberty Reserve's principals have used Grupo Lulu to transfer and disguise Liberty Reserve funds.

41.   Records from Technocash indicate that from August 2011 to November 2011, Banco BAC San Jose (Costa Rica )account number 912049962, in the name of Grupo Lulu, (the "Grupo Lulu Account") received more than $83,000, from the accounts at Technocash associated with Liberty Reserve described above.

42.   Records from Banco Nacional show that on or about April 17, 2012, defendant Azzeddine El Amine received a transfer from Grupo Lulu totaling $58,986.

INTERNET DOMAIN NAMES

43.   Based on my training and experience, I know the following:

a.   A domain name is a simple, easy-to-remember way for humans to identify computers on the Internet.  For example, "www.usdoj.gov" and "www.yahoo.com" are domain names.

24

b.   The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names.  Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "www.example.com."  The hierarchy of domains descends from right to left; each label to the left specifies a subdivision, or subdomain, of the domain on the right.  The right-most label conveys the "top-level" domain.  For example, the domain name "www.example.com" means that the computer assigned that name is in the ".com" top-level domain, is in the "example" second-level domain, and is a web server.

c.   DNS servers are computers connected to the Internet that convert domain names, which are easy for humans to remember, into Internet Protocol ("IP") addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet.  An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination.  DNS servers can be said to "resolve" or "translate" domain names into IP addresses.

d.   For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  For

25

example, the registry for the ".com" top-level domain is VeriSign, Inc., 12061 Bluemont Way, Reston, VA 20190 ("VeriSign").

     e.   If an individual or business wants to purchase a domain name, they buy it through a company called a "registrar." Network Solutions and GoDaddy are two well-known examples of registrars, although there are hundreds of registrars on the Internet. The registrar, in turn, communicates this purchase to the relevant registry. The individual or business who purchases, or registers, a domain name is called a "registrant."

     f.   Registrants control the IP address, and therefore the computer, to which their domain name resolves. Thus, a registrant may easily move a domain name to another computer anywhere in the world simply by changing the IP address at the registry.

     g.   Registries maintain additional information about domain names, including the name and contact information of the registrant.

<u>The Domain Name LIBERTYRESERVE.COM</u>

    44.  As set forth above and in the Indictment, there is probable cause to believe that Liberty Reserve, through its website www.libertyreserve.com, has operated an unlicensed money transmitting business that has been extensively used to launder

the proceeds of criminal activity.

45.   Liberty Reserve uses Amazon Web Services, Inc. ("Amazon") to provide services related to the operation of its website, www.libertyreserve.com. In particular, when a user accesses the www.libertyreserve.com website over the Internet, the user is first directed to one or more computer servers controlled by Amazon before ultimately being directed to the servers which host the www.libertyreserve.com website. The Amazon servers act to, among other things, manage and efficiently route Internet traffic to the www.libertyreserve.com website. In addition, and among other things, the public-facing IP addresses to which the Libertyreserve.com domain name resolves are owned and controlled by Amazon. Accordingly, the services that Amazon provides are crucial for the continuing operation of the Liberty Reserve website.

### The Domain Name SWIFTEXCHANGER.COM

46.   As noted above, Liberty Reserve's website provides a list of pre-approved exchangers that can exchange Liberty Reserve digital currency for cash, and vice-versa.   One of the exchangers listed is Swiftexchanger.com.

47.   From visiting the Swiftexchanger website at Swiftexchanger.com, I have confirmed that this website provides a digital currency exchanger service and prominently displays Liberty Reserve as one of the currencies that can be exchanged

27

through the website, including for U.S. dollars.  The website
advertises "Quick, Superior, and Discreet digital currency
exchange services at low, low rates."

48.  According to incorporation records obtained from
Costa Rica, "Swiftexchanger, S.A." is a Costa Rican company and
is held in the name of defendant Azzeddine El Amine.  In
addition, I have reviewed records showing that El Amine's email
address and telephone number were provided as contact information
to the web-hosting provider for Swiftexchanger.com.

49.  As set forth in the Indictment, El Amine is a
close associate of defendant Arthur Budovsky, and based on emails
I have reviewed, I believe that El Amine and Budovsky control,
and profit from, Swiftexchanger together.  For example:

a.  El Amine discussed the website design for
Swiftexchanger with Budovsky and provided Budovsky the user ID
and password needed to access the site as an administrator.

b.  El Amine regularly emailed Budovsky
spreadsheets showing the fees collected by Swiftexchanger every
month.  The spreadsheets reflected that these proceeds were
divided up between Budovsky and El Amine.

50.  From records I have reviewed from GoDaddy, I have
learned that the Swiftexchanger.com website is being hosted in
the United States.  Further, I know that Swiftexchanger.com
serves users located in the United States based on undercover

transactions that I myself have executed through its website.

51. Notwithstanding that Swiftexchanger.com is doing business in the United States, I have confirmed with the Treasury Department that Swiftexchanger has not been registered as a money transmitting business with the Secretary of the Treasury as required under 18 U.S.C. § 1960 and 31 U.S.C. § 5330.

### The Domain Name MONEYCENTRALMARKET.COM

52. Another of the pre-approved exchangers listed on Liberty Reserve's website is "moneycentralmarket.com."

53. From visiting the moneycentralmarket.com website, I have confirmed that the website provides a digital currency exchanger service and prominently displays Liberty Reserve as one of the currencies that can be exchanged through the website, including for U.S. dollars. Moneycentralmarket.com charges its users a fee for its services.

54. Based on records I have reviewed, the moneycentralmarket.com website is hosted by a company based in the United States, and the account associated with the website is subscribed to in the name of defendant Ahmed Yassine.

55. In addition, I have reviewed emails indicating that Yassine asked defendant Arthur Budovsky for help getting Money Central Market approved as a Liberty Reserve exchanger.

56. Accordingly, I believe that Moneycentralmarket.com is owned and controlled by Yassine.

57.   I have confirmed with the Treasury Department that Money Central Market has not been registered as a money transmitting business with the Secretary of the Treasury as required under 18 U.S.C. § 1960 and 31 U.S.C. § 5330.

### The Domain Name ASIANAGOLD.COM

58.   Another of the pre-approved exchangers listed on Liberty Reserve's website is "AsianaGold.com."

59.   From visiting the "AsianaGold.com" website, I have confirmed that this website holds itself out as offering a digital currency exchanger service and prominently displays Liberty Reserve as one of the currencies that can be exchanged through the website, including for U.S. dollars.  From undercover transactions I have conducted on the website, I know that AsianaGold.com is an active website that conducts monetary transactions in the United States.

60.   Based on records obtained from the Crystaltech Web Hosting, Inc. ("Crystaltech") I have learned that the "AsianaGold.com" website is hosted by Crystaltech.

61.   Based on records I have reviewed, the domain name "AsianaGold.com" was originally registered in 2002 by defendant Arthur Budovsky.

62.   Based on records I have reviewed, I know that the AsianaGold website is currently hosted by a company based in the United States.  AsianaGold's web-hosting account is subscribed in

the name of the former spouse of defendant Vladimir Kats, at an address in Brooklyn, New York that I know to be Kats's current address, and with an email address that I know is used by Kats. I also know from reviewing bank records that Kats has received the proceeds from AsianaGold's exchanger business.

63.  Included in records obtained from Crystaltech was a database related to the AsianaGold website. This database contains a history of transactions titled "Sell Log," which in turn contains records of monetary transactions that occurred on the Asianagold website from 2004 to 2013, some of which were transactions to and from the United States.

64.  I have confirmed with the Treasury Department that AsianaGold has not registered as a money transmitting business with the Secretary of the Treasury as required under 18 U.S.C. § 1960 and 31 U.S.C. § 5330.

The Domain Name EXCHANGEZONE.COM

65.  I have visited the website ExchangeZone.com on numerous occasions.  From reviewing the contents fo the website, I know that, up until April 2013, ExchangeZone.com operated as an "exchanger" service that allowed its users to exchange digital currencies directly with each other.  For example, the website enabled users to purchase Liberty Reserve currency in exchange for other forms of digital currency.  ExchangeZone.com was listed as a "featured" provider of exchange services on the

Libertyreserve.com home page.

66. Likewise, the "Helpful Links" section of the ExchangeZone.com website prominently listed a link to the website for Liberty Reserve. In another section of the ExchangeZone.com website, used to search for digital currency users seeking to trade one type of digital currency for another, Liberty Reserve was listed as the top choice when the user was prompted to select from a dropdown menu the type of currency sought by the user.

67. Based on the foregoing, and my knowledge of Liberty Reserve, I believe that ExchangeZone.com served as an intermediary designed to enable Liberty Reserve users to conduct transactions with individuals using other types of digital currency. Accordingly, I believe that ExchangeZone.com was set up by persons affiliated with Liberty Reserve in order to increase the ease with which Liberty Reserve currency could be exchanged for other currencies and real cash, and thereby increase the appeal and liquidity of Liberty Reserve currency.

68. This conclusion is confirmed by records I have reviewed showing that defendant Mark Marmilev used his credit card to purchase security services for the ExchangeZone.com website. Marmilev is also listed as the primary technical point of contact for ExchangeZone.com in records obtained from the service provider used to host e-mail accounts within the ExchangeZone.com domain. In addition, I know from email records

32

that I have reviewed that defendant Arthur Budovsky has received email updates from GoDaddy, the web hosting provider for ExchangeZone.com, in a form indicating that Budovsky is the registered point of contact for the website. Based on these records, and on my training and experience, I believe that ExchangeZone.com is operated and controlled by defendants Marmilev and Budovsky, and has been used by them in furtherance of Liberty Reserve's illegal activity.

69. Based on emails I have reviewed, I know that from October 2009 to December 2012, ExchangeZone conducted at least approximately 7,528 transactions originating in the United States, and at least approximately 6,354 transactions whose destination was the United States. Additionally, from adding up the total values of transactions that occurred over the ExchangeZone.com system, I know that at least four million dollars in digital currency exchange transactions were processed through ExchangeZone.com during this time period.[3]

---

[3] ExchangeZone.com recently underwent a website redesign. In or about April 2013, ExchangeZone.com displayed a maintenance web page as its homepage. The new homepage includes the following description: "Today it is possible to find a great number of e-currency exchangers in the World Wide Web. We created a service thanks to which anyone will be able to find quickly the most favorable rate to exchange electronic currency." The "About Us" section of the website states: "Our monitoring of exchangers is a simple and convenient tool for automatic exchange. With its help you will know the current rates of the most of [sic] Runet exchange services and choose the most favorable option." This language indicates that ExchangeZone.com is still being used to facilitate the operation of digital

## SEIZURE WARRANT FOR DOMAIN NAMES AND INJUNCTION

70.   As detailed in Exhibit O, which is fully incorporated herein by reference, upon execution of the seizure warrant, the registry for the ".com" top-level domain, VeriSign, shall be directed to make any changes necessary to restrain and lock the Domain Names pending transfer of all rights, title, and interest in the Domain Names to the United States upon completion of forfeiture proceedings.

71.   Upon completion of forfeiture proceedings, all Domain Name Records for the Domain Names maintained by Verisign will be changed to reflect the transfer of ownership to the United States.

72.   I respectfully request permission to effectuate the seizure of the Domain Names at any time of the day or night, as we will be timing the seizure of the Domain Names to the timing of several arrests, searches, and seizures in multiple countries.   It is important the Domain Names not be seized prior to the arrest of certain defendants, so that the defendants are not given advance notice of the takedown.   Conversely, as soon as those defendants are in custody, the Domain Names should be seized, so that individuals cannot continue to conduct illegal activity through the Domain Names. Therefore, having flexibility in timing the seizure of the Domain Names is crucial to the

---

currencies such as Liberty Reserve.

success of this takedown effort.

73.   In my opinion, a restraining order is not sufficient to guarantee the availability of the Domain Names for forfeiture.  By seizing the Domain Names and redirecting them to another website, the Government will prevent third parties from acquiring the Domain Names and using them to commit further crimes.

74.   In addition, the Government is also seeking an injunction, which will assist the Government in executing the seizure warrant with respect to the LibertyReserve.com domain name. The requested Injunction would order Amazon to cease providing services to support the Liberty Reserve website. Such an Injunction is required in order to facilitate the seizure of the Liberty Reserve domain name, in case law enforcement is not able to seize the underlying servers for the Liberty Reserve website at the time of the takedown.  To the extent the underlying foreign servers are not immediately seized, users could bypass the domain name seizure and access the Liberty Reserve website by finding its IP address through publicly available online tools and then typing that IP address directly into a web browser.  Since these publicly available IP addresses are controlled by Liberty Reserve's Amazon web account, the Injunction is a critical part of the takedown operation.

75.   Based on the past experiences of the Secret

Service, there is reason to believe that provision of notice to the Defendants prior to the entry of the restraining order, seizure warrant, and injunction will jeopardize the availability of the assets in question for forfeiture.

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this _23_ day of May, 2013:

TATE A. JARROW
Special Agent
United States Secret Service

36